1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11    LEMUEL BLACKSHIRE,                       No. 2:19-cv-02307-TLN-AC

12                  Plaintiff,

13          v.                                 **ORDER**

14    COUNTY OF YUBA, a Public Entity,
      BRANDON HENDRIZ, an individual,
15    AND DOES 1 through 10, inclusive,

16                  Defendants.

17

18          This matter is before the Court on Defendants County of Yuba ("County") and Branden

19    Hendrix's[1] ("Hendrix") (collectively, "Defendants") Motion for Summary Judgment.  (ECF No.

20    25.)  Plaintiff Lemuel Blackshire ("Plaintiff") filed an opposition.  (ECF No. 26.)  Defendants

21    filed a reply.  (ECF No. 28.)  For the reasons stated herein, Defendants' motion is GRANTED.

22    ///

23    ///

24    ///

25    ///

26    ///

27    _____

28    [1]      Defendants' motion states Hendrix was incorrectly sued as Brandon Hendriz.  (ECF No.
      25.)

                                                1

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

On September 8, 2018, Plaintiff went to the River Front Sports Complex ("Sports Complex") in Marysville, California, in Yuba County.  (ECF No. 26-12 at 5.)  Plaintiff had been invited by the Yuba/Sutter Soccer Club ("Soccer Club") to participate as a vendor in a soccer tournament.  (ECF No. 28-2 at 3.)  At the Sports Complex, he set up his Brotha Lem's BBQ food truck near the soccer field to sell and serve food.  (ECF No. 26-12 at 5.)  Plaintiff was the only African American food vendor present.  (ECF No. 28-2 at 10.)

Plaintiff did not have an active permit to operate his food truck in Yuba County.[3]  (ECF No. 26-12 at 6.)  Plaintiff began operating his food truck and selling food to the public even though he did not have a permit.  (*Id.*)  Plaintiff is aware that operating a food truck requires certain licensing and/or permits based on the location, and he knew this prior to 2018.  (*Id.* at 2.)

---

[2]     The facts in this section come from the evidence referenced in the parties' separate statements and the responses to those separate statements.  (ECF Nos. 25-2, 26-12, 26-13, 28-2.) The Court has carefully reviewed Plaintiff's opposition to Defendants' separate statement, and it is apparent that Plaintiff has attempted to dispute nearly all of Defendants' proffered facts even in instances where Plaintiff's evidence does not create a triable issue of fact.  For example, Plaintiff attempts to dispute Defendants' fact that Plaintiff is aware that operating a food truck requires certain licensing or permits and he knew this prior to 2018 by pointing to evidence that Plaintiff had a permit from Sutter County for 2017 to 2018.  (ECF No. 26-12 at 2.)  Plaintiff having a Sutter County permit does not tend to dispute his awareness of food truck licensing and permitting requirements.

In some circumstances, Plaintiff attempts to dispute Defendants' material fact, but the evidence Plaintiff identifies tends to support Defendants' fact.  For example, Plaintiff tries to dispute Defendants' material fact that Plaintiff recognized Hendrix on September 8, 2018 and knew that Hendrix was a Yuba County health inspector by pointing to evidence that Plaintiff had an earlier encounter with Hendrix and during the earlier encounter Plaintiff knew Hendrix was a Yuba County employee.  (*Id.* at 8.)

Thus, following the Court's careful review of the parties' separate statements and the responses thereto, the Court finds the facts listed in this section to be undisputed.  For certain undisputed facts contained in this section, the Court will explain why those facts are undisputed despite Plaintiff's attempt to dispute them.

[3]     Plaintiff attempts to dispute this fact by asserting he believed he was correctly operating under a Sutter County permit and also asserting that he had been assured by the Soccer Club that it had the proper food permit.  (ECF No. 26-12 at 6.)  Thus, Plaintiff's evidence does not concern whether he had an active Yuba County permit for his food truck.

1   Also on September 8, 2018, Hendrix was employed by the County in the Department of

2   Environmental Health and his title was "Environmental Health Specialist." (*Id.* at 3.) Hendrix

3   was a registered and certified health inspector for the County, and responsible for inspecting and

4   permitting mobile food trucks within Yuba County. (*Id.*) Hendrix had authority to perform

5   unannounced inspections of food trucks at any time of day, on any day, if he observed a situation

6   involving food trucks that presented a possible public health safety risk.[4] (*Id.*)

7   On September 8, 2018, Hendrix was at the Sports Complex attending his daughter's

8   soccer game and he observed three food trucks operating without a permit: (1) Plaintiff's food

9   truck; (2) a pizza food truck; and (3) a café food truck. (*Id.* at 7.) Hendrix knew the three food

10  trucks did not have a permit because Yuba County is a very small community and he did not

11  recognize the three food trucks. (*Id.*) Hendrix verified all three food trucks did not have a permit.

12  (*Id.* at 8–9.)

13  Hendrix approached Plaintiff's food truck and told Plaintiff's daughter, who was helping

14  Plaintiff, that the food truck did not have a valid permit. (ECF No. 28-2 at 6–7.) Hendrix added

15  that he was from the health department. (*Id.*) After Plaintiff saw Hendrix, Plaintiff recognized

16  Hendrix as a health inspector with the County. (*Id.* at 6.) Plaintiff asked if Hendrix was on

17  official business, and Hendrix responded by asking if that was Plaintiff's excuse for not having a

18  permit. (*Id.* at 7.) Hendrix said he was on duty 24/7 and he needed to inspect Plaintiff's truck.

19  (*Id.*) Hendrix yelled and pointed his finger at Plaintiff's daughter and told her not to take any

20  more orders. (*Id.*) Hendrix then said if they took one more order, then he was going to call the

21  sheriff. (*Id.*)

22  ///

---

[4]   To dispute this fact, Plaintiff points to evidence that Hendrix was off-duty, dressed
casually, and did not display County identification. (ECF No. 26-12 at 3.) However, none of
Plaintiff's evidence relates to Hendrix's authority to perform unannounced inspections of food
trucks at any time, and on any day, when there was a possible public health safety risk.
Additionally, Plaintiff cites to California Health and Safety Code § 114390(c), and asserts he
believes he could have refused Hendrix's entry. (*Id.*) Plaintiff's response is nonresponsive to
Defendants' fact because Plaintiff's belief in his ability to refuse Hendrix's entry — and Plaintiff
does not assert he exercised that purported ability — does not bear on Hendrix's authority to
perform unannounced food truck inspections.

Thereafter, Hendrix inspected Plaintiff's food truck, including turning on the hot water, checking to see if Plaintiff had bleach, and measuring the temperature of the refrigerator and saucepot. (*Id.* at 9.) Hendrix then looked into Plaintiff's freezer and told Plaintiff in an arrogant voice to "cover those burgers up." (*Id.*) Hendrix stepped off Plaintiff's food truck and allowed Plaintiff to continue serving food on September 8, 2018, after he did not observe any obvious public health hazards. (*Id.*; ECF No. 26-12 at 11.) Hendrix had inspected Plaintiff's food truck in the same way that he would have inspected a similar food truck that stores, prepares, and serves meat to the public. (ECF No. 26-12 at 9.)

Plaintiff watched Hendrix walk over to the pizza food truck where Hendrix performed an inspection. (*Id.* at 8–9; ECF No. 28-2 at 10.) Hendrix did not step onto the pizza food truck, but instead stuck his head inside the truck to peer around. (ECF No. 28-2 at 10.) Hendrix asked the pizza food truck owner if the owner had a County permit, which the owner did not have. (*Id.* at 9.) Hendrix checked that the pizza food truck had hot and cold water and cleaning supplies, and he performed a visual inspection of the interior. (ECF No. 26-12 at 9.) Hendrix then nicely told the pizza food truck owner that they needed a County permit. (ECF No. 28-2 at 10.) Hendrix confirmed there were no obvious public health hazards and allowed the pizza food truck to continue operating on September 8, 2018. (ECF No. 26-12 at 9.)

Hendrix also inspected the café food truck. (*Id.* at 8–9.) Hendrix checked that the café food truck had hot and cold water and cleaning supplies, and he performed a visual inspection of the interior. (*Id.* at 9.) Hendrix confirmed there were no obvious public health hazards and allowed the café food truck to continue operating on September 8, 2018. (*Id.*)

Altogether, Hendrix instructed Plaintiff and the two other food truck operators that they would need to get a County permit to continue serving food in Yuba County in the future. (*Id.* at 12.) Hendrix's inspection of Plaintiff's food truck took longer than that of the pizza and café food trucks because the other food trucks were not storing raw meat or cooking food on the food trucks. (*Id.* at 9.) Plaintiff's truck posed a greater possibility of risk to the public because it had raw meat and prepared food in the food truck. (*Id.*)

///

1   On September 10, 2018, the County's Environmental Health Division sent a letter to

2   Brotha Lem's BBQ, the pizza food truck operator, the café food truck operator, and the Soccer

3   Club.  (*Id.* at 12; ECF No. 28-2 at 11.)  The letter concerned the unlawful operation without a

4   health permit on September 8, 2018.  (ECF No. 26-12 at 12.)  Each letter had the same language.

5   (*Id.*)

6   On September 20, 2018, Plaintiff went to the County's Environmental Services

7   Department to pay the permitting fee and apply for a permit.  (*Id.* at 13.)  There, he spoke with

8   Margaret Hochstrasser ("Hochstrasser") and asked for Hendrix.  (ECF No. 28-2 at 11.)

9   Hochstrasser said she would check to see if Hendrix was available, and then said Hendrix was not

10  there.  (*Id.*)  Hochstrasser got on the phone with Hendrix, and Hendrix instructed her to tell

11  Plaintiff that his permit was only good for the soccer field.  (*Id.* at 11–12.)  Plaintiff was charged

12  the standard amount for a food truck that cooks food on the premises.  (ECF No. 26-12 at 13.)

13  Plaintiff then paid the permit fee but did not receive a permit.  (ECF No. 28-2 at 11.)

14  On October 3, 2018, Plaintiff went to the County's Environmental Services Department

15  for a food truck inspection.  (ECF No. 26-12 at 13.)  It is the County's custom and practice to

16  perform the inspection after the fees are paid.  (*Id.*)  Two inspectors performed the inspection of

17  Plaintiff's food truck.  (ECF No. 28-2 at 12.)  They took pictures of the inside of Plaintiff's food

18  truck, something that had never happened during an inspection of Plaintiff's food truck.  (*Id.*)

19  The pictures were taken to show Hendrix who was not present and to assist in the inspection

20  process.  (ECF No. 26-12 at 13.)  No County employee made a discriminatory statement or used a

21  racial slur during the inspection.  (*Id.* at 14.)  Plaintiff did not receive his permit on that day.

22  (ECF No. 28-2 at 12.)

23  After the inspection, the County's Environmental Services Department sent Plaintiff a

24  letter on October 3, 2018.  (ECF No. 26-12 at 14.)  The letter identified items that need to be

25  changed, provided, or explained prior to the issuance of a permit.  (*Id.*)  Plaintiff never responded

26  to the October 3rd letter, and he never made any attempt to correct the deficiencies to get a

27  permit.  (*Id.*)  Plaintiff never made any attempts after October 3, 2018, to receive a County

28  permit.  (*Id.*)

1    A similar letter was sent to the pizza food truck operator after the inspection of that truck

2    in September 2018.  (*Id.*)  After the events of September 8, 2018, the pizza food truck paid the

3    appropriate fee, received an inspection, responded to the County's letter, completed the

4    application process, and received a permit.  (*Id.* at 15.)  The café food truck never sought a

5    permit.  (*Id.*)

6        On April 30, 2019, Plaintiff filed the instant action in the Yuba County Superior Court.

7    (ECF No. 1 at 8.)  On November 15, 2019, Defendants removed the action to this Court.  (*Id.* at

8    1.)  On December 23, 2019, Plaintiff filed the operative Second Amended Complaint ("SAC").

9    (ECF No. 7.)  Plaintiff's SAC alleges six causes of action: (1) discrimination pursuant to 42

10   U.S.C. § 1981 ("§ 1981") against the County; (2) discrimination pursuant to California Civil

11   Code § 51 against the County; (3) retaliation pursuant to California Civil Code § 51 against the

12   County; (4) fraud against Hendrix; (5) defamation against Hendrix; and (6) intentional infliction

13   of emotional distress ("IIED") against Hendrix.  (ECF No. 7.)  On July 7, 2021, Defendants filed

14   the instant motion for summary judgment.  (ECF No. 25.)  On July 30, 2021, Plaintiff filed an

15   opposition.  (ECF No. 26.)  On August 5, 2021, Defendants filed a reply.  (ECF No. 28.)

16       **II.    STANDARD OF LAW**

17       Summary judgment is appropriate when the moving party demonstrates no genuine issue

18   of any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.

19   R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary

20   judgment practice, the moving party always bears the initial responsibility of informing the

21   district court of the basis of its motion, and identifying those portions of "the pleadings,

22   depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"

23   which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.*

24   *Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof

25   at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

26   solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at

27   324 (internal quotation marks omitted).  Indeed, summary judgment should be entered against a

28   party who does not make a showing sufficient to establish the existence of an element essential to

6

that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party

1   "must do more than simply show that there is some metaphysical doubt as to the material facts."

2   *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  "Where the record taken as a whole could not lead

3   a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at

4   587.

5        **III.   ANALYSIS**

6        Defendants move for summary judgment on all of Plaintiff's claims based on several

7   grounds.  (ECF No. 25.)  In opposition, Plaintiff asserts summary judgment should be denied on

8   his claims.  (ECF No. 26.)  The Court will address the parties' arguments in turn.

9        **A.   Evidentiary Objections**

10        As a preliminary matter, the Court will address Defendants' objections to Plaintiff's

11   evidence.  (ECF No. 28-3.)  Specifically, Defendants object to Plaintiff's declaration and three of

12   Plaintiff's exhibits.  (*Id.*)  The stated grounds for Defendants' objections are: (1) conclusory; (2)

13   immaterial; (3) lacks foundation; (4) irrelevant; and (5) hearsay.  (*Id.*)

14        "Objections to evidence on the ground that the evidence is irrelevant . . . or constitutes an

15   improper legal conclusion are all duplicative of the summary judgment standard itself."  *Carden*

16   *v. Chenega Sec. & Prot. Servs., LLC*, No. 2:09-cv-01799-WBS-CMK, 2011 WL 1807384, at *3

17   (E.D. Cal. May 10, 2011); *see also Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 954 (E.D. Cal.

18   2017); *Bd. of Trustees of Cal. Winery Workers' Pension Tr. Fund v. Giumarra Vineyards*, No.

19   1:17-cv-00364-SAB, 2018 WL 1155988, at *3 (E.D. Cal. Mar. 2, 2018) (noting immateriality

20   objections are inapplicable on summary judgment); *Minass v. HHC TRS Portsmouth, LLC*, No.

21   EDCV 13-01209-JGB (DTBx), 2014 WL 11398262, at *2 (C.D. Cal. Aug. 19, 2014) (declining

22   to consider objections that the evidence lacked foundation or was conclusory).  "Objections on

23   any of these grounds are superfluous[.]"  *Carden*, 2011 WL 1807384, at *3.

24        Therefore, the Court OVERRULES Defendants' objections asserted on any of the

25   following grounds: (1) conclusory; (2) immaterial; (3) lacks foundation; or (4) irrelevant.

26        A motion for summary judgment, as well as the opposition thereto, may not be supported

27   by hearsay.  *Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1157 (S.D. Cal. 2022).

28   However, "at summary judgment a district court may consider hearsay evidence submitted in an

inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).

Defendants' hearsay objections are limited to objection numbers eight and 47 to Plaintiff's declaration and the objections to three of Plaintiff's exhibits.  (ECF No. 28-3 at 4, 15, 17.)

Objection number eight concerns Plaintiff's testimony that the Soccer Club assured him that they had the proper permit which allows any person or organization to provide food and drink at a public event.  (*Id.* at 4.)  To the extent Plaintiff is offering this evidence to prove that the Soccer Club had the proper permit, it is being offered for the truth of the matter asserted, and thus, is hearsay.  The Court does not find this hearsay evidence could be provided in an admissible form at trial because no individual is identified as the declarant and no hearsay exception applies.[5]  (*See* ECF No. 26-2 at 2); *see Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1037 (C.D. Cal. 2013) (noting the declarant of a hearsay statement was unidentified); *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1122 (C.D. Cal. 2007) (noting the plaintiff would not be able to take the stand at trial and recount statements constituting hearsay).

Regarding Defendants' objection number 47 and the objections to three of Plaintiff's exhibits, to the extent the hearsay objections concern evidence being offered for the truth of the matter asserted, the Court finds the evidence could be presented in an admissible form at trial, such as by live testimony.

Thus, the Court SUSTAINS Defendants' hearsay objection contained in objection number eight and OVERRULES Defendants' hearsay objections contained in objection number 47 and the objections to three of Plaintiff's exhibits.

///

///

---

[5]     The Court notes that even if it could consider the evidence of the Soccer Club having the proper permit, it would not change the Court's determinations *infra* on Defendants' motion for summary judgment.  For example, even if the Soccer Club had the proper permit, it does not change the undisputed evidence that Plaintiff did not have an active permit to operate his food truck in Yuba County, and he was selling food to the public without the necessary permit.  (ECF No. 26-12 at 6.)

B.    Claim One: Discrimination Pursuant to § 1981 Against the County

The County argues summary judgment is appropriate on Plaintiff's first claim because Plaintiff cannot prove intentional discrimination.  (ECF No. 25-1 at 12.)  Plaintiff asserts he has established intentional discrimination.  (ECF No. 26 at 9.)

Section 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

A § 1981 claim requires the plaintiff to establish: "(1) he or she is a member of a racial minority; (2) the defendant intended to discriminate against plaintiff on the basis of race . . . ; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the right to make and enforce contracts, sue and be sued, give evidence, etc.)."  *Peterson v. State of Cal. Dep't of Corr. & Rehab.*, 451 F. Supp. 2d 1092, 1101 (E.D. Cal. 2006); *see also Domino v. Cal. Corr. Health Care Servs.*, No. 1:19-cv-01790-NONE-SKO, 2020 WL 2306900, at *6 (E.D. Cal. May 8, 2020).

"Claims brought under § 1981 are limited to and require proof of intentional racial discrimination."  *James v. US Bancorp*, No. 5:18-cv-01762-FLA (SPx), 2021 WL 4582105, at *6 (C.D. Cal. June 4, 2021) (citing *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*, 694 F.2d 531, 536, 538 (9th Cir. 1982); *Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989)).  "[T]he focus of the judicial inquiry must be whether the plaintiff has proven by a preponderance of evidence facts from which the court must infer, absent rebuttal, that the defendant was more likely than not motivated by a discriminatory animus."  *Gay*, 694 F.2d at 538.

"In the Ninth Circuit, courts apply the *McDonnell Douglas* burden-shifting analysis to section 1981 claims of racial discrimination."[6]  *Makhzoomi v. Sw. Airlines Co.*, 419 F. Supp. 3d 1136, 1148 (N.D. Cal. 2019).  "Under this analysis, the plaintiff bears the initial burden of

---

[6]    The Court notes that no party applies or even mentions the *McDonnell Douglas* burden-shifting analysis in the briefs.  (*See* ECF Nos. 25-1, 26, 28.)

establishing a prima facie case of discrimination." *Id.* "[I]f the plaintiff satisfies the initial

burden of establishing a prima facie case of racial discrimination, the burden shifts to the

defendant to prove it had a legitimate non-discriminatory reason for the adverse action." *Id.*

(alteration in original). "If the defendant meets that burden, the plaintiff must prove that such a

reason was merely a pretext for intentional discrimination." *Id.*

With these § 1981 and discrimination concepts in mind, the Court will analyze Plaintiff's

§ 1981 claim against the County.

Plaintiff's § 1981 claim concerns: (1) the September 8, 2018 encounter; (2) the September

20, 2018 encounter and Plaintiff's payment of permit fees; (3) the inspection of Plaintiff's food

truck on October 3, 2018; and (4) the letter mailed to Plaintiff on October 3, 2018.[7]  (ECF No. 25-

1 at 13–16; ECF No. 26 at 9–14.)  Moreover, the County concedes Plaintiff is a member of a

protected class and that the alleged discrimination concerned one of the activities listed in § 1981.

(ECF No. 25-1 at 13.)  Therefore, the Court will examine each of four events underlying

Plaintiff's claim to determine whether there is a triable issue of fact as to intentional racial

discrimination by the County.

*i.       The September 8, 2018 Encounter*

Regarding the September 8, 2018 encounter, Plaintiff was operating his food truck in

Yuba County and selling food to the public without the necessary permit.  It is undisputed

Hendrix had the authority to perform unannounced food truck inspections at any time, on any

day, if he observed a possible public health and safety risk.  It is also undisputed Hendrix

observed Plaintiff's food truck and the pizza and café food trucks operating without a permit at

the Sports Complex.  Hendrix verified that the three food trucks did not have a permit and

---

[7]       Plaintiff states in his declaration that following September 8, 2018, Hendrix spread lies to his coworkers and other community members to prevent Plaintiff from doing business in Yuba County.  (ECF No. 26 at 4; ECF No. 26-2 at 2.)  However, this is conclusory testimony by Plaintiff, without detailed facts and supporting evidence, and thus, insufficient to raise a genuine issue of fact.  *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).  Additionally, Plaintiff does not reference this purported event in his arguments on his § 1981 claim.  (*See* ECF No. 26 at 9–14.)

1   performed an inspection on all three food trucks.[8]  It is undisputed that Hendrix's inspection of

2   Plaintiff's food truck took the longest because it was storing raw meat and prepared food in the

3   truck, which was not the case for the other two food trucks.  Hendrix allowed all three food trucks

4   to continue operating, but he instructed the operators that they would need to get a Yuba County

5   permit to continue serving food in the future.

6          Nothing in the record raises an inference that Plaintiff's race was a factor in any conduct

7   by the County during the September 8, 2018 encounter, including Hendrix's investigation of

8   Plaintiff's food truck.  First, it is undisputed that Plaintiff was selling food to the public without

9   the necessary permit, and this gave cause for Hendrix to inspect Plaintiff's food truck.

10          Additionally, Plaintiff's separate statement references Plaintiff's declaration testimony

11  that race motivated Hendrix's actions (ECF No. 26-13 at 1–3) and Hendrix harassed Plaintiff (*id.*

12  at 6), but Plaintiff's conclusory testimony, without detailed facts and supporting evidence, does

13  not raise genuine issues of fact.  *F.T.C.*, 104 F.3d at 1171.  Although Plaintiff points to evidence

14  that Hendrix acted more nicely toward the staff at another food truck and did not threaten to call

15  the sheriff on them (ECF No. 26-13 at 9), that is insufficient to create a triable issue as to whether

16  Hendrix acted with racially discriminatory intent.  *See Alvarado v. Colvin*, No. CV12-10010

17  AJW, 2016 WL 370681, at *6 (C.D. Cal. Jan. 28, 2016) (holding that rude, disrespectful, and

18  disruptive conduct was not racial discrimination when there was no evidence from which a

19  reasonable juror could infer racially discriminatory animus).  Moreover, while Plaintiff asserts he

20  was embarrassed by Hendrix, Plaintiff does not argue Hendrix used any racially insensitive or

21  derogatory language on September 8, 2018.  (*See* ECF No. 26 at 9–12); *see also Gulaid v. CH2M

22  Hill, Inc.*, No. 15-CV-04824-JST, 2016 WL 5673144, at *8–10 (N.D. Cal. Oct. 3, 2016)

23  _____

24  [8]      Plaintiff's separate statement references the deposition testimony of his brother Ray
Blackshire that Hendrix did not inspect other trucks on September 8, 2018.  (ECF No. 26-8 at 4;
25  ECF No. 26-13 at 11–12.)  The Court finds this does not create a triable issue as to Hendrix
inspecting the other food trucks because Plaintiff's declaration states Hendrix went over to the
26  pizza food truck, asked the pizza food truck owner if they had a County permit and hot water,
peered around the inside of the food truck, and told the food truck owner they needed a permit.
27  (ECF No. 26-2 at 7.)  Thus, to the extent Ray Blackshire's deposition testimony is offered to
prove that Hendrix only inspected Plaintiff's food truck and no other, Plaintiff has waived that
28  assertion because it is contradicted by Plaintiff's own declaration.

12

1   (allegations of the defendant's derogatory comments and embarrassment of plaintiff was

2   insufficient to establish an employment discrimination claim).

3        Plaintiff points to an earlier encounter with Hendrix taking place between 2014 and 2016

4   (ECF No. 26 at 5–6), but nothing stated in connection with the earlier encounter gives rise to an

5   inference of racially discriminatory intent on September 8, 2018.  Taking Plaintiff's evidence as

6   true, during the earlier encounter, Hendrix approached Plaintiff's food truck and told Plaintiff he

7   needed to move his truck and fill out some paperwork regarding where Plaintiff kept his truck.

8   (ECF No. 26-13 at 4–5.)  Plaintiff told Hendrix that he was asking Plaintiff to lie regarding the

9   placement of Plaintiff's food truck and Hendrix walked away.  (*Id.* at 5.)  Plaintiff's evidence

10  does not suggest that during this earlier encounter Hendrix used a racial slur or said or did

11  anything that was racially motivated.  (*See id.* at 4–5.)  Moreover, even if Hendrix asked Plaintiff

12  to lie on paperwork, that does not suggest Hendrix acted with racially discriminatory intent during

13  this earlier encounter or on September 8, 2018.[9]  *See Plymale v. Dyer*, 837 F. Supp. 2d 1077,

14  1087 (E.D. Cal. 2011) (finding no evidence to suggest a decisionmaker had racially

15  discriminatory intent against the plaintiff, who was white, even if there was evidence the

16  decisionmaker "favor[ed] Hispanics").

17       Accordingly, the evidence does not show a triable issue as to whether Plaintiff's race was

18  a factor in the County's conduct during the September 8, 2018 encounter.

19                  *ii.        The September 20, 2018 Encounter*

20       On September 20, 2018, the undisputed evidence is that Plaintiff went to the County's

21  Environmental Services Department to pay the food truck permitting fee and apply for a permit

22  and that he was charged the standard amount.  Plaintiff states in his declaration that there was a

23  _____

24  [9]     Plaintiff's separate statement references Ray Blackshire's deposition testimony that he
    understood Plaintiff and Hendrix knew each other "so [Ray Blackshire] guess[es] they got it in
25  for [Plaintiff] or something."  (ECF No. 26-8 at 4; ECF No. 26-13 at 11–12.)  The Court finds this
    does not create a triable issue as to Hendrix having racially discriminatory intent because Ray
26  Blackshire's "guess" is unsupported speculation.  *See Marya v. Warner/Chappell Music, Inc.*, 131
    F. Supp. 3d 975, 999 (C.D. Cal. 2015) (noting unsupported speculation cannot create a triable
27  issue of fact).  Additionally, even if this testimony was not speculation, it does not generate a
    triable issue because, at most, it could lead to an inference that Hendrix's conduct was motivated
28  by his prior history with Plaintiff, not by Plaintiff's race.

                                      13

"hassle" before he paid the permit fee, but he does not further detail what the hassle entailed. (ECF No. 26-2 at 8.)  Plaintiff's declaration also states Hendrix instructed Hochstrasser to tell Plaintiff that Plaintiff's permit was only good for the soccer field, but this was unfair because all other vendor's permits were good for all of Yuba County.  (*Id.*)  It is undisputed that Plaintiff did not ultimately receive a permit from the County.

Taking Plaintiff's evidence as true, as required on summary judgment, a reasonable juror could not conclude that Plaintiff's race was a factor in any of the County's conduct during the September 20, 2018 encounter.  While Plaintiff testifies there was a hassle before he paid the permit fee, he does not provide any detailed facts regarding what the hassle entailed.  *See F.T.C.*, 104 F.3d at 1171 (stating a party's conclusory testimony, without detailed facts and supporting evidence, does not raise genuine issues of fact).

Additionally, Hendrix's instruction to Hochstrasser on the validity of Plaintiff's permit does not raise a triable issue as to racially discriminatory intent because Plaintiff provides no evidence from which it could be inferred that Hendrix gave the instruction because of Plaintiff's race.[10]  For example, Plaintiff testified at his deposition that County employees did not use a racial slur or say anything racially motivated during the September 20, 2018 encounter.  (ECF No. 25-3 at 60–62.)  Thus, while Plaintiff states Hendrix's instruction was unfair, unfairness does not equate with actionable discrimination.

Finally, while Plaintiff did not receive a permit on September 20th or thereafter, it is undisputed that the County sent him a letter on October 3, 2018, that identified items that needed to be changed before the issuance of a permit, but Plaintiff never responded to the letter or attempted to correct the deficiencies to get a permit.  In contrast, the pizza food truck inspected by Hendrix on September 8, 2018, at the Sports Complex received a similar letter, but it responded to the letter, paid the permit fee, underwent an inspection, completed the permit application, and received a permit.  Thus, the record is devoid of evidence or inferences of the County's

---

[10]     The Court is also skeptical of whether Hendrix's instruction about Plaintiff's permit could constitute discrimination because it is undisputed that Plaintiff never ultimately received a permit from the County.  Thus, even if Hendrix instructed that Plaintiff's permit had limited validity, Plaintiff did not receive a permit limited in where it could be used.

14

1   discriminatory intent in connection with Plaintiff not receiving a permit on September 20, 2018 or
2   thereafter.

3          In sum, the evidence concerning the September 20, 2018 encounter does not show a
4   triable issue of fact as to whether Plaintiff's race was a factor in the County's conduct.

5                          *iii.*          *The Inspection of Plaintiff's Food Truck on October 3, 2018*

6          It is undisputed that on October 3, 2018, Plaintiff went to the County for a food truck
7   inspection.  It is also not in dispute that County employees performed the inspection and took
8   pictures of Plaintiff's truck.  Plaintiff had never experienced an inspection where the inspectors
9   took pictures of his food truck, but Plaintiff does not dispute that the pictures were taken to show
10  Hendrix because he was not present for the inspection and to assist in the inspection process.

11         There is no evidence or inferences of the County's racially discriminatory intent in
12  connection with the October 3rd inspection.  While the County inspectors did not have their own
13  thermometers and had to use Plaintiff's, Plaintiff offers no argument or evidence from which it
14  can be inferred that the County's lack of thermometers was evidence of discriminatory intent.
15  (*See* ECF No. 26 at 13; ECF No. 26-13 at 11.)  Further, although Plaintiff had never experienced
16  a food truck inspection where the inspectors took pictures, he does not dispute the County's
17  nondiscriminatory reason for the pictures, that is to show Hendrix because he was not present
18  during the inspection and to assist in the inspection process.

19         Plaintiff also points to how each time he tried to contact Hendrix, it took a few days for
20  Hendrix to return the call, but Plaintiff does not attempt to argue or offer evidence that Hendrix's
21  delay in returning calls was due to Plaintiff's race.  (*See* ECF No. 26 at 13; ECF No. 26-13 at 11.)
22  Lastly, while Plaintiff identifies how he did not receive his permit on the day of the inspection,
23  the Court has already discussed how it is undisputed that Plaintiff did not respond to the County's
24  October 3, 2018 letter identifying deficiencies, attempt to correct those deficiencies, or try to seek
25  a permit after October 3, 2018.

26         Accordingly, there is no triable issue as to whether the County's conduct in connection
27  with the October 3, 2018 inspection was motivated by Plaintiff's race.
28  ///

1      *iv.       The Letter Mailed to Plaintiff on October 3, 2018*

2          As stated, it is undisputed that the County sent Plaintiff a letter on October 3, 2018, that

3   identified items that needed to be changed before the issuance of a permit, but Plaintiff never

4   responded to the letter or attempted to correct the deficiencies to get a permit.

5          For his argument concerning the October 3rd letter, Plaintiff makes various arguments that

6   appear to have no connection with the letter or lack evidentiary support.  (*See* ECF No. 26 at 14.)

7   For example, Plaintiff asserts that he was the only vendor that Hendrix threatened (*id.* at 14), but

8   Plaintiff's evidentiary support for this assertion concerns Hendrix's conduct during the September

9   8, 2018 encounter, not the October 3rd letter (ECF No. 26-2 at 7).  Additionally, Plaintiff argues

10  he did not receive his permit because of information that went to Hendrix, but no evidentiary

11  support for this argument is referenced in Plaintiff's separate statement or found in Plaintiff's

12  declaration.  (*See* ECF Nos. 26-2, 26-13.)

13         Moreover, the Court has discussed *supra* how it is undisputed that Plaintiff did not

14  respond to the County's letter or attempt to correct the deficiencies referenced therein.  In

15  contrast, the pizza food truck inspected by Hendrix on September 8, 2018, at the Sports Complex

16  received a similar letter, but it responded to the letter, paid the permit fee, underwent an

17  inspection, completed the permit application, and received a permit.  Accordingly, there is no

18  triable issue of fact as to whether the County's conduct in connection with the October 3, 2018

19  letter was motivated by Plaintiff's race.

20         In sum, there is no genuine dispute of material fact as to whether the County intentionally

21  discriminated against Plaintiff because of his race and the County is entitled to judgment as a

22  matter of law.  Accordingly, the Court GRANTS Defendants' motion for summary judgment as

23  to Plaintiff's first claim for discrimination pursuant to § 1981.

24         C.     Claim Two: Discrimination Pursuant to California Civil Code § 51 Against

25                the County

26         Defendants argue Plaintiff's second claim fails because the Unruh Civil Rights Act

27  ("Unruh Act") does not apply to government entities and there was no intentional discrimination.

28  (ECF No. 25-1 at 17.)  Plaintiff does not address his second claim or Defendants' argument that

16

the Unruh Act does not apply to government entities, but he does assert there was intentional

discrimination in connection with his § 1981 claim.  (*See* ECF No. 26 at 9.)

California Civil Code § 51 codifies the Unruh Act and provides that all persons within

California are "free and equal" and "no matter what their sex, race, color, religion, ancestry,

national origin, disability, medical condition, genetic information, marital status, sexual

orientation, citizenship, primary language, or immigration status are entitled to the full and equal

accommodations, advantages, facilities, privileges, or services in all business establishments of

every kind whatsoever."

"California courts have interpreted the term 'business establishment' in the 'broadest

sense reasonably possible[.]'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1124

(9th Cir. 2008).  However, courts have held that public entities are not considered "business

establishments" depending on the conduct they are engaging in.  *See, e.g.*, *Brennon B. v. Superior

Ct.*, 13 Cal. 5th 662, 684 (2022) (holding a school district was not a business establishment when

it provided educational services); *Harrison v. City of Rancho Mirage*, 243 Cal. App. 4th 162, 175

(2015) (holding a city was not a business establishment when it amended its municipal code);

*Anderson v. Cnty. of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *6 (N.D. Cal. Sept.

13, 2010) (holding a county was not a business establishment when operating a jail); *Ryan v.

Cnty. of Imperial*, No. 21cv1076-JO-KSC, 2022 WL 4819656, at *10 (S.D. Cal. Sept. 29, 2022)

(holding a county was not a business establishment when conducting or attending board

meetings).

Intentional discrimination is required for violations of the Unruh Act.  *Harris v. Capital

Growth Invs. XIV*, 52 Cal. 3d 1142, 1149 (1991), *superseded by statute on other grounds as

stated in Munson v. Del Taco, Inc.*, 46 Cal. 4th 661 (2009); *see also Greater L.A. Agency on

Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014).  Because of the

similar analysis applied to both § 1981 claims and Unruh Act claims, courts may analyze § 1981

and Unruh Act claims together.  *See, e.g.*, *James*, 2021 WL 4582105, at *7; *Maystrenko v. Wells

Fargo, N.A.*, No. 21-cv-00133-JD, 2021 WL 5232221, at *4 (N.D. Cal. Nov. 10, 2021).

///

17

On a motion for summary judgment, the plaintiff's failure to address a claim serves as the plaintiff abandoning that claim. *Est. of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011) (affirming summary judgment on a claim because the plaintiff "abandoned th[e] claim by failing to raise it in opposition to the [defendant's] motion for complete summary judgment"); *see also Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (quoting *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005).

Here, Plaintiff does not address his second claim or Defendants' assertion that the County is not subject to the Unruh Act. As such, Plaintiff has abandoned his second claim. Even if Plaintiff had not abandoned his claim, as discussed *supra* for the § 1981 claim, Plaintiff has not presented evidence from which the Court can infer there was intentional discrimination by the County based on Plaintiff's race. Thus, Plaintiff's failure to establish a triable issue as to his Unruh Act claim is another basis for summary judgment.

Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's second claim for discrimination pursuant to California Civil Code § 51.

D.    Claim Three: Retaliation Pursuant to California Civil Code § 51

Defendants argue Plaintiff's third claim fails because the Unruh Act does not apply to government entities and there was no intentional discrimination. (ECF No. 25-1 at 17.) Plaintiff does not address his third claim, the existence of retaliation, or Defendants' argument that the Unruh Act does not apply to government entities, but he does assert there was intentional discrimination in connection with his § 1981 claim. (*See* ECF No. 26 at 9.)

On a motion for summary judgment, the plaintiff's failure to address a claim serves as the plaintiff abandoning that claim. *Est. of Shapiro*, 634 F.3d at 1060; *see also Shakur*, 514 F.3d at 892. Plaintiff has provided no argument or legal authority regarding his third claim, the existence of retaliation, or Defendants' assertion that the County is not subject to the Unruh Act. As such, Plaintiff has abandoned his third claim.[11]

---

[11]    Although not raised in the parties' briefs, the Court notes that the Unruh Act "does not encompass discrimination based on retaliation." *Gayer v. Polk Gulch, Inc.*, 231 Cal. App. 3d 515, 519 (1991); *see also Heilbut v. Equinox Holdings, Inc.*, No. A157441, 2020 WL 4251399, at *10 (Cal. Ct. App. July 24, 2020) ("The Unruh Act does not provide a basis for [the plaintiff's]

1    Accordingly, the Court GRANTS Defendants' motion for summary judgment as to

2 Plaintiff's third claim for retaliation pursuant to California Civil Code § 51.

3    E.    Claim Four: Fraud Against Hendrix[12]

4    Defendants argue summary judgment is appropriate on Plaintiff's fourth claim because

5 there is no evidence of fraud.  (ECF No. 25-1 at 18–19.)  Specifically, Defendants argue there was

6 no false representation by Hendrix.  (*Id.* at 19.)  Plaintiff asserts that he has established fraud.

7 (ECF No. 26 at 14.)

8    To establish a claim for fraudulent misrepresentation, the plaintiff must prove:

9
> (1) the defendant represented to the plaintiff that an important fact
> was true; (2) that representation was false; (3) the defendant knew
10
> that the representation was false when the defendant made it, or the
> defendant made the representation recklessly and without regard for
11
> its truth; (4) the defendant intended that the plaintiff rely on the
> representation;  (5)  the  plaintiff  reasonably  relied  on  the
12
> representation; (6) the plaintiff was harmed; and (7) the plaintiff's
> reliance on the defendant's representation was a substantial factor in
13
> causing that harm to the plaintiff.

14 *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 605–06 (2014); *see also Tapia v. Davol,*

15 *Inc.*, 116 F. Supp. 3d 1149, 1165 (S.D. Cal. 2015).

16    Plaintiff's fraud claim is based on Hendrix's alleged false representation that he was on

17 duty as a health inspector on September 8, 2018.  (ECF No. 7 at 13–15; ECF No. 26 at 14–15.)  It

18 is undisputed that Hendrix told Plaintiff he was on duty 24/7, and Plaintiff's declaration states

19 that Hendrix was off-duty, dressed casually, and did not display any identification.  (ECF No. 26-

20 2 at 3.)  Defendants do not dispute that Hendrix was at the Sports Complex because he was

21 attending his daughter's soccer game.  However, Defendants have provided undisputed evidence

22 that on September 8, 2018, Hendrix was employed by the County, registered and certified as a

23

24 retaliation cause of action.''); *Banga v. Kanios*, No. 16-cv-04270-RS, 2016 WL 7230870, at *4

25 n.9 (N.D. Cal. Dec. 14, 2016).  Thus, even if Plaintiff had provided argument regarding his third
claim, the Court is skeptical of whether the claim would be legally valid.

26
[12]    While the SAC identifies Plaintiff's fourth claim as a "fraud" claim, both parties provide
27 legal authority concerning a claim of fraudulent misrepresentation.  (ECF No. 25-1 at 19; ECF
No. 26 at 14.)  Therefore, the Court treats Plaintiff's fourth claim as a claim for fraudulent
28 misrepresentation.

1   health inspector for the County, and responsible for inspecting and permitting mobile food trucks

2   within Yuba County.  It is also undisputed that Hendrix had the authority to perform

3   unannounced food truck inspections at any time, and on any day, if he observed a situation

4   involving food trucks that presented a possible public health safety risk.  Accordingly, while

5   Hendrix was present at the Sports Complex to attend his daughter's soccer game, dressed

6   casually, and lacking identification, he still had the authority to inspect Plaintiff's food truck

7   unannounced.  Thus, the evidence before the Court demonstrates there is no triable issue as to the

8   purported falsity of Hendrix's statement that he was on duty.  As such, there is no genuine dispute

9   of material fact as to Plaintiff's fourth claim and Hendrix is entitled to judgment as a matter of

10  law.

11          Accordingly, the Court GRANTS Defendants' motion for summary judgment as to

12  Plaintiff's fourth claim for fraud.

13                  F.       Claim Five: Defamation Against Hendrix

14          Defendants argue summary judgment is appropriate on Plaintiff's fifth claim for

15  defamation because there was no false publication or defamatory statement, and there was

16  nothing that had a natural tendency to injure.  (ECF No. 25-1 at 20–21.)  Plaintiff argues there

17  was a false publication and a defamatory statement, and he points to the encounter on September

18  20, 2018 involving Plaintiff, Hendrix, and Hochstrasser.[13]  (ECF No. 26 at 15–16.)

19          Under California law, a defamation claim requires the plaintiff to prove a publication that

20  is: (1) false; (2) defamatory; (3) unprivileged; and (4) has a natural tendency to injure or causes

21  special damages.  *John Doe 2 v. Superior Ct.*, 1 Cal. App. 5th 1300, 1312 (2016); *Bowles v.*

22  *Constellation Brands, Inc.*, 444 F. Supp. 3d 1161, 1172 (E.D. Cal. 2020).

23          A "[p]ublication, which may be written or oral, is defined as a communication to some

24  third person who understands both the defamatory meaning of the statement and its application to

25  _____

26  [13]      Although the SAC's defamation allegation concerns Hendrix's actions on various dates
    (*see* ECF No. 7 at 15–16), Plaintiff's opposition solely addresses the September 20, 2018
    encounter when arguing how there was a false publication and defamatory statement (*see* ECF
27  No. 26 at 15–16).  Therefore, the Court focuses on the September 20, 2018 encounter when
    analyzing if there is a triable issue as to the existence of a false publication and defamatory
28  statement.

the person to whom reference is made." *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1179 (2000).  "Defamation claims are 'limited to statements that either directly or indirectly disparage plaintiff personally.'" *Young Hollywood LLC v. White Ops, Inc.*, No. CV 2003334 PA (RAOx), 2020 WL 6162795, at *4 (C.D. Cal. Aug. 6, 2020) (quoting *Starbuzz Tobacco, Inc. v. Abdallah*, No. CV 10-03833 MMM (RZx), 2011 WL 13214313, at *3 (C.D. Cal. Nov. 2, 2011)).

For Plaintiff's argument that there is a triable issue as to the existence of a false publication, he points to fact number 46 in his separate statement.  (ECF No. 26 at 15–16.) However, Plaintiff's fact number 46 references no communication by Hendrix to any third person.  (*See* ECF No. 26-13 at 10.)  Thus, Plaintiff has not shown there to be a triable issue as to the existence of a publication, let alone a false publication.

For Plaintiff's argument about there being a defamatory statement, he identifies Hendrix's instruction to Hochstrasser that Plaintiff's permit was only good for the soccer field.  (ECF No. 26 at 16.)  Plaintiff asserts Hendrix's instruction was unfair because all other vendors' permits were good for all of Yuba County.  (*Id.*)  Assuming Hendrix gave Hochstrasser that instruction, it does not constitute a defamatory statement.  Where Plaintiff's permit was valid "do[es] not call into question Plaintiff's honesty, integrity or competence as required to state a claim for defamation." *Young Hollywood LLC*, 2020 WL 6162795, at *4; *see also Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 550 (1985) (noting that statutes prohibiting defamation are only "concerned with statements that cast aspersions upon the plaintiff directly or by imputation fairly implied, not statements that, though disparaging of the quality of his business or goods, do not call into question the plaintiff's honesty, integrity or competence.").  Thus, while Plaintiff asserts Hendrix's instruction was "unfair" because all other vendors' permits had greater validity, it does not constitute a defamatory statement.

In sum, the evidence shows there is no triable issue as to the elements of Plaintiff's defamation claim and Hendrix is entitled to judgment as a matter of law.  Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's fifth claim for defamation.

///

1              G.      Claim Six: IIED Against Hendrix

2          Defendants argue summary judgment is appropriate on Plaintiff's sixth claim because

3   there is no evidence of intent, no extreme or outrageous conduct, and Plaintiff did not experience

4   severe emotional distress.  (ECF No. 25-1 at 22–23.)  Plaintiff asserts that he has established his

5   claim for IIED.  (ECF No. 26 at 16.)  Plaintiff bases his IIED claim on the September 8, 2018

6   encounter.  (*See* ECF No. 7 at 17–18; ECF No. 26 at 16–17.)

7          An IIED claim requires: (1) extreme and outrageous conduct by the defendant with the

8   intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the

9   plaintiff suffering severe or extreme emotional distress; and (3) actual and proximate causation of

10  the emotional distress by the defendant's outrageous conduct.  *Hughes v. Pair*, 46 Cal. 4th 1035,

11  1050 (2009).  "Generally, conduct will be found to be actionable where the 'recitation of the facts

12  to an average member of the community would arouse his resentment against the actor, and lead

13  him to exclaim, 'Outrageous!''"  *Cochran v. Cochran*, 65 Cal. App. 4th 488, 494 (1998).

14         Examples of conduct found to be outrageous include threats of harm or death to a plaintiff

15  and his family for failure to sign a union agreement, *Kiseskey v. Carpenters' Trust for So.*

16  *California*, 144 Cal. App. 3d 222, 229–30 (1993), sexual harassment, *Hughes*, 46 Cal. 4th at

17  1051, and newscasters' actions recording an interview with young children at their home and

18  abruptly advising them that their playmates had been killed in a murder suicide, *KOVR-TV, Inc. v.*

19  *Superior Ct.*, 31 Cal. App. 4th 1023, 1027 (1995).  On the other hand, courts have granted

20  summary judgment dismissing IIED claims where an employer screamed at the plaintiff

21  criticizing her performance, threatened to throw her out of the department, and used threatening

22  gestures, *Schneider v. TRW, Inc.*, 938 F.2d 986, 992–93 (9th Cir. 1991), and where an employer

23  made repeated statements that "anyone over age forty is senile and a liar," and called the plaintiff

24  a senile liar, *Yurick v. Superior Court*, 209 Cal. App. 3d 1116, 1124–26, 1129 (1989).

25         In connection with a municipal inspection of real property, threats of eviction and

26  financial harm, and speaking in a "demeaning tone" are not outrageous conduct.  *Bagdasaryan v.*

27  *City of L.A.*, No. 2:15-cv-01008-JLS (KES), 2018 WL 6113104, at *22, 29 (C.D. Cal. Oct. 22,

28  2018), *report and recommendation adopted*, 2019 WL 1718827 (C.D. Cal. Feb. 14, 2019).

1    Here, there is no triable issue as to whether Hendrix's conduct on September 8, 2018

2    constituted outrageous conduct.  Like *Bagdasaryan*, Hendrix's conduct took place in the context

3    of a government inspection.  Hendrix's statement about how he was going to call the sheriff is

4    akin to the threats of eviction and financial harm in *Bagdasaryan*, which was not outrageous

5    conduct.  Additionally, even if Hendrix had acted in an arrogant manner, that is no more

6    outrageous than the "demeaning tone" of the inspector in *Bagdasaryan*.  While sexual harassment

7    can amount to outrageous conduct, there is no harassment-related claim, racial or otherwise, at

8    issue here and summary judgment has been granted on Plaintiff's racial discrimination claims

9    *supra*.  Therefore, "[n]one of the challenged actions are comparable to the conduct that California

10   courts have deemed give rise to IIED liability, i.e., sexual harassment, threats of death, or

11   harassment of young children."  *Bagdasaryan*, 2018 WL 6113104, at *29.

12   Accordingly, there is no genuine dispute of material fact as to whether Hendrix's conduct

13   on September 8, 2018, was outrageous and Hendrix is entitled to judgment as a matter of law.

14   Thus, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's sixth claim

15   for IIED.

16   **IV.   CONCLUSION**

17   For the foregoing reasons, the Court hereby GRANTS Defendants' Motion for Summary

18   Judgment.  (ECF No. 25.)  The Clerk of Court is directed to enter judgment in Defendants' favor

19   and close the case.

20   IT IS SO ORDERED.

21   **DATED:  January 2, 2023**

22

23

24                                          _____
                                            Troy L. Nunley
25                                          United States District Judge

26

27

28
                                                    23